The undersigned have reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Hoag. The appealing party has not shown good ground to reconsider the evidence; receive further evidence; rehear the parties or their representatives; or amend the Opinion and Award, except for minor changes.
* * * * * * * * * * *
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties at the hearing as:
STIPULATIONS
1. A Pre-Trial Agreement was submitted on 17 April 1995 and is incorporated herein by reference.
2. The parties are subject to and bound by the provisions of the North Carolina Workers' Compensation Act.
3. An employer-employee relationship existed between plaintiff and defendant-employer at all relevant times.
4. The date of the alleged injury is 6 January 1994, and the part of plaintiff's body alleged to be involved is the right lung.
5. Plaintiff's average weekly wage is to be provided by a Form 22.
6. Defendant is self insured with EBComp Services, Inc. as the adjusting agent.
7. Parties stipulated to the following exhibits:
a. Union Memorial Hospital
 b. Radiology referral reports dated 6 January 1994 and 9 January 1994.
 c. Records of Dr. Fred D. McQueen (7 pp. including material from Hamlet Hospital).
 d. Notes from Dr. McQueen dated 14 March 1994, 26 August 1994 and 11 March 1994.
 e. Letter dated 29 August 1994 to Henry E. Crowe from McQueen Medical Center.
 f. Carolina Medical Associates report and records of Dr. Michael Shapiro.
8. The contested issues are as follows:
 a. Did plaintiff suffer an occupational disease or an injury by accident arising out of and in the course of his employment with defendant-employer?
 b. If so, was plaintiff disabled and what is the extent of his disability?
* * * * * * * * * * *
EVIDENTIARY RULING
All objections raised during the depositions of Dr. Fred McQueen, Jr. and Dr. Michael Shapiro were ruled on in accordance with the law and the Opinion and Award in this matter.
* * * * * * * * * * *
The Full Commission adopts the findings of fact found by the Deputy Commissioner as follows:
FINDINGS OF FACT
1. On 6 January 1994 plaintiff was employed by defendant-employer as a utility and cleaning man at defendant-employer's turkey processing plant in Marshville, North Carolina. Plaintiff's duties included pick-up and removal of turkey scraps from around the floor in the turkey thigh processing area.
2. On the morning of 6 January 1994, near the beginning of his shift, plaintiff was working near the turkey thigh processing area when he was exposed to carbon dioxide (CO2).
3. On that very same morning of 6 January 1994, plaintiff's supervisor, James Miller, experienced a strange sensation in his nasal passages and throat, when he was exposed to carbon dioxide in the same area.
4. Employees of defendant-employer had at previous times been exposed to CO2 in the turkey thigh processing area.
5. At defendant-employer's plant, turkey thighs passed on a conveyor belt and were, during some shifts but not all, exposed to a CO2 fogging process which cooled the thigh meat. The turkey thighs passed through the processing line and were then deposited in an open "bird" bin.
6. The use of the carbon dioxide is limited to when production orders call for fresh product. If the product is to be packed fresh, turkey thigh meat is cooled with the CO2 fogging process in the area where plaintiff worked. When orders called for frozen product, the CO2 machine is not used. It is clear from the testimony of workers in the plant, that the carbon dioxide machine was used on the shift just preceding the early morning shift of plaintiff.
7. Steven Blake, who worked in the plant, was involved in the testing of CO2 levels after plaintiff reported his exposure. A residual level of carbon dioxide was obtained. Federal standards allow for many times the amount actually detected. It should be noted that there was a .03 level of carbon dioxide subsequent to the plaintiff's report of exposure.
8. Plaintiff reported the carbon dioxide exposure to his supervisor and then went to the first aid department. He was advised to go outside and get fresh air. However, plaintiff began coughing and kept on coughing. His situation did not improve. Plaintiff's testimony is completely credible.
9. Plaintiff then went to see the company doctor, Dr. Henry in Monroe, North Carolina. Dr. Henry prescribed cough medicine and sent plaintiff to the hospital in Monroe for an x-ray.
10. Plaintiff reported to the hospital for an x-ray and then went home.
11. When plaintiff's x-ray was examined at the hospital, it was determined that one of his lungs had collapsed. The hospital contacted plaintiff and told him to return immediately.
12. Plaintiff returned to Union Memorial Hospital and was admitted for five days. After being released from the hospital, plaintiff did not return to work although he made one brief and unsuccessful attempt to resume his duties.
13. Plaintiff subsequently presented to his family physician, Dr. Fred McQueen, in Hamlet for treatment.
14. Plaintiff, at the request of defendant-employer, was also later examined by Dr. Michael Shapiro.
15. Dr. Ed Bauer was the emergency room physician who examined plaintiff at Union Memorial Hospital on 6 January 1994. Dr. Bauer took a medical history in which plaintiff attributed his shortness of breath and coughing to exposure to carbon dioxide at defendant-employer's turkey processing plant.
16. Plaintiff's chest x-ray, taken at the hospital at the request of Dr. Bauer, demonstrated an almost completely collapsed right lung. Dr. Bauer performed an operation which involved the insertion of a chest tube into plaintiff's right lung in order to re-inflate it.
17. Plaintiff was in good health at the time of his exposure to carbon dioxide. He was not a smoker, having stopped smoking some fourteen years previously.
18. A day after plaintiff's right lung was fully expanded, a comparison x-ray study was made. Some blebs appeared in the right apex of the right lung. Some linear densities projected over the scapula, representing portions of the blebs. The right lung was fully re-expanded, but there was still some sub-segmental atelectasis and soft infiltrate in the left base as well as sub-segmental atelectasis in the right base.
19. Subsequently, plaintiff presented to Dr. McQueen. Plaintiff had multiple complaints including a weakness in his arm and leg which were suggestive of a stroke. The stroke-like symptomology was in no way medically related to plaintiff's pneumothorax. Dr. McQueen took him out of work and recommended that plaintiff not return to an atmosphere where he was exposed to chemicals.
20. Plaintiff returned to Dr. McQueen on 11 March 1994 and 14 April 1994. In April, Dr. McQueen examined plaintiff and conducted ABG and pulmonary function studies. The results indicated reduced pulmonary flow as well as some chronic bronchitis.
21. It is uncontroverted that plaintiff did not smoke in 1994, had not recently smoked and had not previously had pneumonia, recurrent bronchitis, tuberculosis or hemoptysis.
22. By August 1994, plaintiff was suffering from chronic bronchitis, hypertension, pain in his legs, and shortness of breath with any exertion. Prior to 6 January 1994, however, plaintiff could perform his work and the normal activities of life without difficulty. By August 1994, plaintiff became dyspneic walking short distances.
23. Dr. Shapiro ordered an extensive battery of tests to rule out a number of physiological etiologies for plaintiff's condition as well as the etiology of plaintiff's pneumothorax.
24. Plaintiff presented to Dr. Shapiro with continued complaints of shortness of breath. However, plaintiff did not have nocturnal awakenings with shortness of breath and did not complain of lower extremity problems. He did have a non-productive cough, hypertension, irregular heartbeat and a thickening of the ventricular wall. Plaintiff underwent a pulmonary function test, a QV scan to rule out the possibility of a blood clot in the lung, a cardiopulmonary stress test evaluating heart efficiency and the lungs ability to oxygenate blood under stress. The pulmonary function test revealed no abnormalities. The cardiopulmonary stress test, despite a less than optimal effort by plaintiff to perform, revealed normal lung functions and fairly good heart functions. Plaintiff did have a long history of high blood pressure, was obese and out of shape.
25. Plaintiff had no permanent lung damage and there were no lingering effects from the pneumothorax. Plaintiff had no physiological problems related to the lungs in sufficient magnitude to keep him out of work and no lung damage related to the carbon dioxide exposure.
26. Dr. Shapiro released plaintiff to return to work the week of 14 February 1994.
27. Dr. Shapiro did not find that plaintiff suffered from chronic bronchitis and disagreed strongly with Dr. McQueen's diagnosis.
28. Greater weight is given to the findings of Dr. Shapiro, as the pulmonary specialist, than to those of Dr. McQueen. Dr. McQueen's diagnosis of bronchitis and the attenuated reasoning underlying the etiology of the bronchitis are particularly unconvincing.
29. Both physicians, however, were in agreement about the precipitating cause of plaintiff's pneumothorax of the right lung.
30. Plaintiff had blebs in his right lung. He underwent a severe coughing spell brought about by his exposure to carbon dioxide in defendant-employer's plant. This irritant precipitated the cough and resulted in plaintiff's right lung pneumothorax.
31. Plaintiff reached maximum medical improvement after his lung was re-inflated and was capable of returning to work on 14 February 1994.
32. Plaintiff does not suffer from bronchitis or any other occupational disease. Plaintiff has failed to prove by a preponderance of the competent, credible evidence which is admissible at trial that he was exposed to chemicals other than carbon dioxide. A one time exposure to carbon dioxide could not have precipitated any occupational disease.
33. Plaintiff has failed to prove by the preponderance of the competent, credible evidence admissible at trial, that he was exposed to any chemical which could have caused an occupational disease or that he had a disease which could be classified as an occupational disease.
* * * * * * * * * * *
Based on the findings of fact, the Full Commission concludes as follows:
CONCLUSIONS OF LAW
1. Since plaintiff was exposed to carbon dioxide, which precipitated the collapse of his right lung, plaintiff sustained an injury by accident on 6 January 1994 arising out of and in the course and scope of his employment with defendant-employer. N.C. Gen. Stat. § 97-2(6).
2. As a result of the injury by accident, Plaintiff was disabled and incapable of earning wages at any time during that period of five and 4/7 weeks. Plaintiff is entitled to five and 4/7 weeks of temporary total disability at the compensation rate of two-thirds (2/3) of his average weekly wage for his collapsed lung. N.C. Gen. Stat. § 97-29.
3. Plaintiff has completely recovered from his collapsed lung and does not have any permanent partial disability. N.C. Gen. Stat. § 97-31.
4. Plaintiff does not suffer from an occupational disease. N.C. Gen. Stat. § 97-53.
5. Plaintiff is entitled to be reimbursed for any medical treatment which he underwent as a result of his injury by accident sustained on 6 January 1994. N.C. Gen. Stat. § 97-25.
6. Plaintiff's compensation has accrued and shall be paid in a lump sum amount subject to an attorney's fee of 25% of the amount of the total compensation. N.C. Gen. Stat. § 97-90.
* * * * * * * * * * *
Based upon the foregoing findings of fact and conclusions of law, the Full Commission affirms the holding of the Deputy Commissioner and enters the following:
AWARD
1. Defendants shall compensate plaintiff for 5 4/7 weeks of temporary total disability at a compensation rate of 2/3 of his average weekly wage from 6 January 1994 through 13 February 1994 for the injury by accident which plaintiff sustained.
2. The amount in paragraph one has accrued and shall be paid in a lump sum amount to plaintiff minus 25% of the total which shall be paid directly to plaintiff's attorney.
3. Plaintiff is not entitled to any compensation for permanent partial disability.
4. Plaintiff shall be compensated or reimbursed for any medical treatment which he underwent as a result of his injury by accident sustained on 6 January 1994.
5. Plaintiff did not suffer from an occupational disease and his claim for benefits based upon disablement due to occupational disease must be and are hereby DENIED.
6. Defendants shall bear the cost.
This is the 6th of March 1997.
 S/ _____________ DIANNE C. SELLERS COMMISSIONER
CONCURRING:
S/ ____________ THOMAS J. BOLCH COMMISSIONER
S/ ____________ COY M. VANCE COMMISSIONER